1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LAW OFFICE OF**
  **ROBERT G. LOEWY, P.C.**
Robert G. Loewy (SBN 179868)
20 Enterprise, Suite 310
Aliso Viejo, California 92656
Telephone:  (949) 468-7150
Facsimile:  (949) 242-5105
rloewy@rloewy.com

**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
Joseph H. Meltzer (*PHV to be filed*)
Geoffrey C. Jarvis (*PHV to be filed*)
Meredith L. Lambert (*PHV to be filed*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
gjarvis@ktmc.com
mlambert@ktmc.com

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
Stuart A. Davidson (*PHV to be filed*)
Mark J. Dearman (*PHV to be filed*)
Jason H. Alperstein (*PHV to be filed*)
Ricardo J. Marenco (*PHV to be filed*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone:  (561) 750-3000
Facsimile:  (561) 750-3364
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com
jalperstein@rgrdlaw.com
rmarenco@rgrdlaw.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| BRADLEY BERGERON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MONEX DEPOSIT COMPANY, MONEX CREDIT COMPANY, NEWPORT SERVICES CORPORATION, LOUIS CARABINI, and MICHAEL CARABINI,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Bradley Bergeron, on behalf of himself and all others similarly situated ("Plaintiff"), brings this putative class action against Defendants Monex Deposit Company ("MDC"), Monex Credit Company ("MCC"), and Newport Services Corporation ("NSC") (together, "Monex" or the "Company"); and Louis Carabini and Michael Carabini (together, the "Individual Defendants") (collectively, "Defendants").   The claims alleged herein arise from Defendants' false and misleading advertisements and other marketing communications made from July 16, 2011, through March 31, 2017 (the "Class Period"), which misrepresented the purported benefits and downplayed or concealed the significant risks associated with investing in precious metals through Monex's off-exchange "Atlas" trading platform.

Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.   Plaintiff's information and belief is based on the independent investigation of the undersigned counsel, which included, among other things, a review and analysis of:   (1) information publicly disclosed on Monex's website; (2) public reports and news articles about Monex; (3) the public court filings in the matter captioned *Commodity Futures Trading Commission v. Monex Deposit Co., et al.*, No. 1:17-cv-06416 (N.D. Ill.) (the "CFTC Action"); and (4) other publicly available material and data identified herein.   Plaintiff's counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants, or are exclusively within their custody or control.   Plaintiff believes, and heretofore alleges, that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.    **INTRODUCTION**

1.    This action arises from Defendants' multi-year scheme to deceive thousands of retail customers nationwide, including Plaintiff and other members of the proposed Class (defined below), out of hundreds of millions of dollars, while executing tens of thousands of off-exchange retail commodity transactions directly with their customers.

2.    During the Class Period, Plaintiff and other members of the proposed Class invested in precious metals through Monex's off-exchange "Atlas" commodities trading platform.  As part of its scheme to falsely advertise the benefits (and underplay or conceal the substantial risks) of Atlas investments, Monex falsely touted the Atlas program as a safe and profitable way for customers to invest in precious metals.  In truth, however, the Atlas program is neither safe nor profitable, as the vast majority of Atlas customers suffer substantial and sometimes devastating, life-altering losses.

3.    Through the Atlas program, Monex offers customers the opportunity to open leveraged trading positions in gold, silver, platinum, and palladium on its off-exchange, unregulated trading platform.  The Atlas program is not for persons who simply wish to acquire precious metals for cash at the market price.  Instead, it is a program through which customers make numerous trades and seek to increase their returns by trading on margin (*i.e.*, having a substantial portion—sometimes 75 percent or more—of their purchases made with funds they have borrowed from Monex).

4.    For each transaction, Monex serves as the counterparty (*i.e.*, it sells or leases the metals to Atlas customers and purchases metals from them).  There are no third parties involved in these transactions—just Monex and its customers.

5.    Monex controls all aspects of its Atlas trading platform, including the price for each trade.  Thus, rather than set prices based upon trades in an open

market, Monex sets the bid price (the price at which it will purchase metals from its customers), and the ask price (the price at which it sells metals to those customers).  Monex, as the counterparty to every transaction, earns substantial revenue from the bid/ask spread (*i.e.*, it buys low and sells high), as well as from commissions, service fees, and interest on loans.

6.     Despite the volatility of precious metals markets and the inherent risks of leveraged trading, Monex aggressively markets the Atlas program to potential customers as a secure and profitable investment opportunity.  For example, Monex claims, among other things, that:  (1) precious metals investments offer a form of "wealth insurance" due to their "true intrinsic value;" (2) Atlas customers have exclusive control over their precious metals investments; and (3) Monex account representatives are trained and experienced investment professionals who specialize in precious metals markets and whose function is to provide Atlas customers with reliable investment advice.

7.     Contrary to these representations, Monex operates the Atlas program with the intent to exploit all Atlas customers, especially those who lack commodities trading experience or familiarity with precious metals markets. Indeed, the Atlas program is structured in such a way that it is virtually impossible for Atlas customers to reap the purported wealth-protection and profit-potential benefits of their precious metals investments.  For example, because Monex stands to profit from larger price spreads, rather than set prices based on the precious metals markets, the Company can—and does—utilize its unilateral power to impose bid and ask prices, such that the bid/ask spreads it quotes to its customers can be ***up to 100 times greater*** than price spreads for similar trades on a regulated exchange.  Moreover, any potential gains that Atlas customers may realize from their leveraged Atlas trades are typically offset by the substantial commissions, service fees, and interests on loans that Monex charges in connection with the

Atlas program.  Finally, Atlas customers are commonly subject to margin calls (requiring the customer to deposit additional money if the equity in the customer's account falls below a specified level) or forced liquidation of their trading positions (for failure to meet a margin call or where the equity falls below a specified level) as a result of the constant erosion of their account equity by Monex's interest and service-fee charges.

8.    Not only is the Atlas program specifically designed to enrich Monex at the direct expense of unwitting Atlas customers, but also Monex account representatives are trained and incentivized—through compensation tied directly to account volume and trading activity, rather than account performance—to engage in high-pressure sales tactics aimed at encouraging customers to open leveraged Atlas trading accounts and place frequent trade orders.  Thus, despite portraying themselves as fiduciaries for Atlas customers, Monex account representatives provide misleading and unsound investment advice, and downplay or conceal the risks associated with leveraged Atlas account trading.

9.    The goal of Monex's misrepresentations regarding the safety and profitability of the Atlas program is to convince Atlas customers, including Plaintiff and other members of the proposed Class, that they reasonably can be expected to earn positive returns on their Atlas accounts with limited downside risks.

10.   Based on this reasonable expectation, and absent knowledge of the risks associated with leveraged Atlas account trading, which Defendants actively concealed throughout the Class Period, Plaintiff and other members of the proposed Class invested in the Atlas program and inevitably sustained significant losses.

11.   Accordingly, this action asserts claims against Defendants for violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq*.,

violation of the California Consumers Legal Remedy Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, fraudulent concealment, and unjust enrichment.

## II.   JURISDICTION AND VENUE

12.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 7 U.S.C. § 25(c).  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.  This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2).  If a class is certified in this action, the matter in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000.  In addition, there are more than 100 members of the Class, members of the Class are citizens of states different from any Defendant, and greater than two-thirds of the members of the Class are citizens of states other than California.

13.   Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b) and 7 U.S.C. § 25(c).  Acts giving rise to the claims alleged herein, including Defendants' scheme to deceive Plaintiff and other Class members, occurred in this District.  In addition, the Company is headquartered in this District with its principal executive offices in Newport Beach, California.  Further, Defendants conduct a substantial amount of business in this District.  Finally, Defendants' agreements governing customers' accounts provide for venue in Orange County, California with regard to the claims alleged herein.

## III.   PARTIES

### A.   Plaintiff

14.   Plaintiff Bradley Bergeron is an individual and citizen of the state of Illinois, residing in DeKalb, Illinois.  Between April 2016, and the present, Plaintiff traded in precious metal commodities through the Atlas program and

suffered approximately $7,000 in losses as a result of the misconduct alleged herein.

15.    Mr. Bergeron invested a total of $26,000 in personal funds in the Atlas program.  Mr. Bergeron initially decided to invest these funds in the Atlas program after seeing Monex's television advertisements touting the program as a safe and profitable way to invest in precious metals.  After opening an Atlas account, Mr. Bergeron placed several leveraged trade orders based on the recommendations of his account representative, whom he believed was serving as his investment advisor and fiduciary.  Mr. Bergeron's account representative would frequently call him to solicit trade orders.  Mr. Bergeron did not know that Monex served as the counterparty and set the price spreads for each of his trades.  In September 2017, Mr. Bergeron sought to engage in a transaction involving units of silver, but was told by his Monex account representative that his transaction could not be carried out because the equity in his account did not meet Monex's margin requirement, which Monex had recently increased without notice to Mr. Bergeron.

### B.    Defendants

16.    Defendant MDC is a California limited partnership with its principal place of business at 4910 Birch Street, Newport Beach, California.  MDC buys from and sells precious metals to its customers through sales representatives who solicit retail customers via telephone and email to enter into Atlas transactions.  MDC acts as a counterparty to each Atlas transaction and accepts funds in connection with its solicitation and acceptance of orders for Atlas transactions.  MDC is not registered with the Commodity Futures Trading Commission (the "CFTC") in any capacity.[1]

---

[1] *See* Declaration of CFTC Senior Investigator Jeffrey Gomberg Pursuant to 28 U.S.C. § 1746 ("Gomberg Decl.") filed in the CFTC Action as Exhibit 1 to

17.     Defendant MCC is a California limited partnership with its principal place of business at 4910 Birch Street, Newport Beach, California.  MCC provides loans to Atlas customers who decide to finance their Atlas transactions and sells and/or leases precious metals to Atlas customers.  MCC issues monthly account statements to customers and accepts funds in connection with its extension of credit to secure Atlas transactions.  MCC acts as the counterparty to some Atlas transactions.  MCC is not registered with the CFTC in any capacity.[2]

18.     Defendant NSC is a California limited partnership with its principal place of business at 4910 Birch Street, Newport Beach, California.  NSC performs administrative and accounting services for MCC and MDC, as well as their affiliates.  NSC solicits and accepts orders for Atlas transactions, advertises the Atlas program on television, and offers Atlas trading through other marketing practices.  NSC accepts funds in connection with its solicitation and acceptance of orders for Atlas transactions.  NSC is not registered with the CFTC in any capacity.[3]

19.     Defendant Louis Carabini is the Founder of Monex and was substantially involved in overseeing all of Monex's operations during the Class Period.  Specifically, throughout the Class Period, Louis Carabini was the President of MDC's general partner, Comco Management Corporation ("Comco").[4]   In this capacity, Louis Carabini executed contracts on behalf of

---

Appendix of Exhibits to Plaintiff's Motion for Preliminary Injunction, Vol. I (ECF No. 8), at ¶ 22.

[2] *See id*.

[3] *See id.*

[4] *See id*., Ex. 6 (December 2, 2016 Private Placement Memorandum for Scala Funding Company, L.L.C. ("2016 Scala PPM")), at 26; *see also* Excerpts of Investigative Testimony of Michael Carabini ("M. Carabini Tr."), filed in the

Comco.[5]  Louis Carabini was also a signatory on most of Monex's bank and other financial accounts.[6]  In addition, Louis Carabini had the authority to hire and fire Monex employees.  Finally, in applications filed by Monex with the State of California to register the Company as a telemarketing firm, Louis Carabini signed the applications and described himself as being "in charge" of Monex.[7]

20.     Throughout the Class Period, Defendant Michael Carabini was the President of NSC and the self-described "operational overseer" of MDC and MCC and their affiliated companies.[8]  MCC is 80.6% owned by two "personal, family trusts of Michael A. Carabini and his wife," with respect to which Michael Carabini serves as the trustee and a beneficiary.[9]  Michael Carabini also owns 5% of MCC directly.[10]  MCC's general partner, Metco Management Corporation, is 100% owned by Madison Investments ("Madison"), another trust controlled by Michael Carabini.[11]  Likewise, MDC is 80.6% owned by two personal, family trusts of Michael A. Carabini and his wife," with respect to which Michael Carabini serves as the trustee.[12]  Michael Carabini also owns 11% of MDC

---

CFTC Action as Exhibit 15 to Appendix of Exhibits to Plaintiff's Motion for Preliminary Injunction, Vol. II (ECF No. 9-12), at 10:3.

[5] *See* M. Carabini Tr. at 9:22-10:7.

[6] *See* Gomberg Decl., Ex. 7 (signature cards for Monex and affiliate bank accounts).

[7] *See id.*, Ex. 8 (2014 California Telephonic Seller Registration Application Form), at 7.

[8] *See* M. Carabini Tr. at 7:5-10.

[9] *See* 2016 Scala PPM at 26; *see also* M. Carabini Tr. at 16:1-4.

[10] *See* 2016 Scala PPM at 26; *see also* M. Carabini Tr. at 20:13-17.

[11] *See* 2016 Scala PPM at 26; *see also* M. Carabini Tr. at 9:5-13.

[12] *See* 2016 Scala PPM at 26.

directly.[13] MDC's general partner, Comco, is also 100% owned by Madison.[14] As President of Metco, Michael Carabini executed agreements on Metco's behalf.[15] Michael Carabini was also a signatory on all of Monex's bank and other financial accounts.[16] In addition, Michael Carabini had the authority to hire and fire Monex employees. Finally, Michael Carabini was primarily responsible for Monex's advertisements and marketing, including the content of the Company's website located at www.monex.com.

## IV.   FACTUAL ALLEGATIONS

### A.   The Atlas Program

21.    Monex's Atlas program offers customers the opportunity to invest in precious metals by opening an Atlas account, through which they can: (1) purchase or sell physical metals, such as coins or bars, after full payment for actual delivery; and (2) use Monex's unregulated, off-exchange trading platform to place futures-like trades on gold, silver, platinum, and palladium on a leveraged basis, with Monex serving as the counterparty to each transaction.

#### 1.  The Atlas Account Agreements

22.    To open an Atlas account, each customer must sign and return two standardized Atlas Account Agreements setting forth, in small-type legal jargon, the terms and conditions of the customer's precious metals transactions with MDC, as well as MCC's financing of same.

23.    The Atlas Account Agreements include various provisions limiting Atlas customers' rights to litigate potential claims in connection with the Atlas

---

[13] *See id.*

[14] *See id.*

[15] *See* M. Carabini Tr. at 15:17-22.

[16] *See* Gomberg Decl., Ex. 7.

Program. For example, the Atlas Account Agreements include a choice-of-law provision stating that the agreements and any legal proceedings related thereto are governed by California law.[17]

24. The Atlas Account Agreements also contain a forum selection clause that requires all legal proceedings asserting claims arising out of or relating to the agreements or the Atlas customers' transactions with Monex to be filed in Orange County, California. To this end, the Atlas Account Agreements expressly provide that: (1) "for all purposes, [the Atlas customer] entered into this Agreement in Orange County, California, notwithstanding any events that may occur outside Orange County, including the manner, timing or location of the delivery or receipt of the acceptance of this Agreement by either party hereto"; and (2) "the following events, among others, occurred in Orange County, California: the solicitation, negotiation, execution, and consummation of this Agreement, as well as the initial payment of monies and an subsequent Customer payment of monies, and written confirmation of each transaction."[18]

25. In addition, the Atlas Account Agreements include an arbitration agreement requiring certain Atlas customers "to submit all disputes, claims or controversies seeking damages in excess of $50,000, arising out of or relating to any transactions with [Monex] or to the breach, termination, enforcement, interpretation, validity, enforceability, or alleged unconscionability of any part of this Agreement, to final and binding arbitration . . . ."[19] Because the proposed Class defined below is limited to Atlas customers seeking damages that do not

---

[17] *See id*., Ex. 14 (Monex Atlas Account Agreements), at ¶¶ 15.9, 28.

[18] *See id*. at ¶¶ 15.10, 30.

[19] *See id*. at ¶¶ 16(a), 30.1.

exceed $50,000, the arbitration agreement does not apply to the claims alleged herein.

26.     For those Atlas customers whose claims for damages exceed $50,000, the arbitration agreement included within the Atlas Account Agreements has additional provisions that further restrict such customers' rights and available remedies.  For example, the arbitration agreement includes a class action waiver clause requiring such Atlas customers to "bring claims against [Monex] only in his/her/its individual capacity, and not as a plaintiff or class member in any purported class representative proceeding."[20]   Because this class action waiver clause is contained within the arbitration agreement and not an independent provision of the Atlas Account Agreements, it does not apply to the claims alleged herein.

## 2.  Atlas Account Transactions

27.     Approximately 25% of Atlas account transactions involve the use of margin purchases, whereby Atlas customers may purchase precious metals on credit.[21]   To obtain such financing, Atlas customers generally must deposit an initial margin of 22-25% of their open trading positions.  MCC then finances the balance of the customer's purchase through a loan.   MDC receives the full purchase cost by receiving funds from the customer and the customer's loan advance from MCC.  The loans are payable on demand and bear variable interest rates that are determined by MCC.  The purchased precious metals serve as collateral for the customer's loan and are stored at a depository pursuant to a contract between Monex and the depository.[22]

---

[20] *See id*. at ¶¶ 16(g), 30.7.

[21] *See* Gomberg Decl., Ex. 2 (March 22, 2013 Private Placement Memorandum for Concord Funding Company, L.L.C.) ("2013 Concord PPM"), at 25.

[22] *See id*., Ex. 25 (MCC Loan Pool and MDC Inventory Borrowing Base), at 1-2.

28.     During the Class Period, Monex executed approximately 140,000 trades for more than 12,000 Atlas customer accounts engaged in leveraged precious metals trading through the Atlas program.  Approximately 25% of these trading positions opened by leveraged Atlas customer accounts were short-term (*i.e.*, opened and closed within two weeks).

29.     Atlas customers do not make monthly interest or service fee payments on the loans they take out to finance their trading positions.  Rather, Monex deducts these charges from each customer's account equity—which is the value of the customer's metal, less the customer's loan balance—and then adds it to the loan balance on the account.  As a result, an Atlas customer's account equity is constantly eroded by the addition of Monex's interest and service fee charges to the customer's loan balance.

30.     If the equity in an Atlas account declines to a specified level of the total account value—the "call" or "margin" level (which is unilaterally set by Monex and can be changed at will)[23]—Monex may issue a margin call and require the customer to immediately deposit additional funds into the trading account or offset an open position to raise the equity level above Monex's margin requirement.  A customer's failure to meet a margin call within a specified time period (which can be as short as 24 hours) allows Monex to forcibly liquidate a portion of the customer's metal holdings to satisfy the margin requirement.  Monex may change its margin requirements at any time in its sole discretion, and failure to meet the increased required level can result in a forced sale of metals.

---

[23] A call or margin level of 50% percent would mean that half of all of the metals in an account had been acquired with money borrowed from Monex, while a margin or call requirement of 25%, would mean that 75% of the account assets were acquired with borrowed money.

31.     Monex also is authorized to automatically force-liquidate an Atlas customer's trading positions (without a margin call or any notification to the customer) if the customer's account equity declines to 7%. To this end, Monex's system has an "auto-force sell" feature that automatically liquidates Atlas customers' trading positions if there is a sudden price movement in the precious metals markets causing the equity in their Atlas accounts to drop below this equity level. When an Atlas customer's account is subject to automatic force-liquidation, Monex books the liquidation order to the customer's account based on the cash value of the metals sold back to Monex, less commissions, and applies the proceeds from the sale to the customer's loan balance. Monex can execute the automatic force-liquidation of multiple Atlas accounts on a "pool-wide" or "batch" basis. Historically, this system has allowed Monex to earn revenues from commissions on forced sales that far exceed the losses it has sustained from loan defaults.[24]

32.     During the Class Period, more than 3,000 out of 12,000 leveraged Atlas trading accounts were subject to a margin call, and at least 1,850 of these accounts had trading positions force-liquidated. Thus, approximately 30% of leveraged Atlas accounts were subject to a margin call and/or forced liquidation of trading positions during the Class Period.

33.     Monex has complete control over its Atlas trading platform, including the price for every trade. Monex generally sets prices by tracking the spot prices of precious metals traded on other regulated commodity exchanges and then quoting the price at which it will sell (the "ask" price) and the price at which it will buy (the "bid" price). The midpoint between Monex's bid and ask price is referred

---

[24] *See* Gomberg Decl., Ex. 25 (MCC Historical Loan Performance Summary, Oct. 7, 2011), at 7 (noting that between 1987 and 2011, "aggregate commission gains on foreclosures far exceed[ed] the miniscule loan losses" experienced).

to as the "spot" price, which the Company publishes on the internet during regular business hours.  Monex then charges a "spread," or the difference between the bid and ask prices, on each transaction.

34.     During the Class Period, Monex generally charged a 3% spread between its bid and ask prices for Atlas program trades, which far exceeds the price spreads charged for trades of equivalent size on regulated commodity exchanges.  For example, the spread between bid and ask prices for 5,000 ounces of silver on the CME Group's COMEX contract market is equivalent to $25, while the spread for the same amount of silver on Monex's Atlas trading platform with a spot price of $17 would incur a spread charge of approximately $2,550, or more than 100 times the spread cost of equivalent COMEX transactions.

35.     Monex generates a substantial portion of its revenue from the price spread charged on each trade.  During the Class Period, Monex's revenue from the wide price spreads it charged totaled approximately $95 million.

36.     Monex also has complete control over the metals traded on the Atlas trading platform.  For example, Atlas customers with leveraged open trading positions do not take physical delivery of the precious metals underlying their trading positions because most of the metals they purportedly own are held as collateral for the loans from Monex used to purchase those metals.  Instead, such metals are stored in depositories pursuant to contracts, which authorize Monex to control the disposition of the stored metals, between Monex and such depositories.

37.     Following the execution of an Atlas account trade, Monex generates a "Commodity Title Transfer Notices" ("CTTN") that is mailed from the depository to the Atlas customer stating that the depository "is authorized to transfer or deliver the described commodities to [Monex] upon receipt by [the depository] of written or oral instructions from [Monex] . . .  and upon so doing, [the depository] is free

of all liability to [the Atlas customer] or other parties."[25]  The CTTN further states that the customer "shall not grant a security interest or other right in or otherwise pledge any commodities held by [the depository] to any party other than [Monex] or [the depository], and [the depository] will not recognize any such interest, right or pledge."[26]

38.    In fact, the only way for Atlas customers to take possession of metals from Monex is to make full payment for the metals (*i.e.*, completely pay off any loans from Monex), request actual delivery of specific physical metals, and have Monex ship the metals to them, to a pick-up location, or to the customer's agent.

39.    Atlas customers can place long or short trades with the option to place stop or limit orders[27] to manage their trading positions.  When an Atlas customer opens a long position, Monex purportedly transfers to the customer ownership of the metals underlying the customer's trading position, including the financed portion of the position.  In reality, however, this so-called "transfer" is merely a book entry in Monex's records.  In certain situations, Monex can close out the customer's long position at any time in its sole discretion, at a price of its choosing, and without any prior notice to the customer.

40.    Similarly, when an Atlas customer opens a short position, Monex purports to loan the Atlas customer the precious metals, which the Atlas customer immediately sells back to Monex.  Again, however, no such transfer of physical assets actually occurs.  Rather, Monex makes a book entry in its records that can be

---

[25] Gomberg Decl., Ex. 21 (Sample CTTN).

[26] *Id*.

[27] A stop order, also referred to as a stop-loss order, is an order to buy or sell a particular metal once the price of the metal reaches a specified price, known as the stop price. When the stop price is reached, a stop order becomes a market order.  A limit order is an order to buy or sell a metal at a specific price or better.

closed out under certain circumstances in Monex's sole discretion and at a price of its choosing.

### B.    Monex's Inventory and Financing Structure

41.    Monex finances a significant portion of its precious metals inventory through two investment vehicles controlled by Monex:   Concord Funding Company, L.L.C. ("Concord") and Scala Funding Company, L.L.C. ("Scala"), each of which is owned by affiliates of MCC and MDC.[28]  Through both of these investment vehicles, Monex sells asset-backed notes to investors and uses the proceeds from these sales to purchase metals and fund Monex's business operations.[29]  The notes are secured by a trust estate that includes all of Monex's interests in a pool of loans originated by MCC to finance Atlas customers' trading positions.

42.    Monex's agreements with Concord and Scala require that Monex have the ability to liquidate its customers' trading positions at any time in order to pay down its financing obligations.[30]  If Monex falls short in repaying the Concord and Scala notes, it will liquidate customer trading positions to pay back investors.

43.    Specifically, the agreements provide that if a funding deficiency exists for five consecutive days, Monex must increase the required equity levels for Atlas accounts and issue and enforce margin calls to the extent necessary to rectify this deficiency.[31]  Likewise, if Monex fails to maintain funds at the levels required under its agreements with Concord and Scala, it must issue a written demand for repayment in full of Atlas customers' loans, and, if necessary, liquidate the related

---

[28] *See* 2016 Scala PPM, 1.

[29] *See id*. at 3-4; 2013 Concord PPM, 3-4.

[30] *See* 2013 Concord PPM, 18; Scala PPM , 17

[31] *See* 2016 Scala PPM, 8; 2013 Concord PPM, 9, 41.

metals collateral to an extent sufficient to generate collections to meet these required levels.[32]

44.     In addition to using the Scala and Concord investment vehicles to finance its operations, Monex has a $25 million line of credit from Wells Fargo Bank ("Wells Fargo"), and a $50 million revolving credit line through Farmers & Merchants Bank ("F&M").[33]   As with Monex's other financing arrangements, the collateral for these lines of credit include Atlas customer loans and inventory.[34] Moreover, in the event of a default by Monex, both creditors may require Monex to immediately liquidate Atlas customers' trading positions.[35]

45.     Monex and Wells Fargo also entered into a depository agreement with Delaware Depository Services Company ("DDSC") for the storage of metals subject to their credit agreement.  According to the depository agreement, Monex has control over the metals, while Wells Fargo is authorized to direct the release of the metals in accordance with its instructions.[36]   The agreement does not contain any provisions authorizing Atlas customers to exercise control over the stored metals.[37]

46.     Similarly, the metals purchased by Atlas customers that have been designated as collateral for Monex's line of credit with F&M are held primarily at

---

[32] *See* 2016 Scala PPM, 9; 2013 Concord PPM, 9.

[33] *See* Gomberg Decl., Ex. 36 (April 20, 2012 Monex-Wells Fargo Credit Agreement); Ex. 38 (F&M September 3, 2013 Monex Loan Approval Memo).

[34] *See id.*

[35] *See id.*

[36] *See id.*, Ex. 37 (April 20, 2012 Monex-Wells Fargo-DDSC Depository Agreement).

[37] *See id.*

an F&M vault, or at a DDSC vault, where F&M has its own depository account.[38] F&M monitors the Atlas account metals within its possession and control and prepares a memorandum to its senior management tracking the amount of metal held by F&M as collateral for Monex's line of credit.[39]

### C.     Monex Data Management System

47.     Monex actively monitors Atlas customers' transactional data.  This data, which is stored in an internal database, is used to generate reports summarizing information related to the performance of each Atlas account for Company management, including Defendants Louis and Michael Carabini.

48.     These reports include, among others: (1) a daily "Position Report" summarizing each Atlas trading account's equity, cushion before a margin call, available cash, trading position value, and profit or loss on trading positions; (2) a "Position Report Summary," which tracks additional information for each Atlas account, including the number of trades executed by the account, profits or losses, the number of long versus short trades, the total market value of trading positions for each account, and available equity for additional trades; (3) a "Customer Unrealized Loss" report showing unrealized losses, realized profits or losses, and the market value of open trading positions for each Atlas customer account; and (4) "Forced Liquidations" and "Equity Calls" reports detailing the number of forced liquidations and margin calls issued each month.

49.     Based on the CFTC's analysis of transactional data for 2,185 leveraged Atlas accounts during the Class Period, approximately 90% of these accounts realized net losses, including losses from trading, interest charges, and

---

[38] *See id.*, Ex. 39 (F&M Loan Approval File), 9.

[39] *See id.*, Ex. 41 (June 17, 2016 Memorandum re: Commodity Audit of Monex Collateral as of May 31, 2016),

other fees, and excluding profits and losses from metals sold back to Monex.[40] According to the CFTC's estimates, total net realized losses from leveraged trading positions opened and closed during the Class Period, including interest charges and fees, were at least $290 million.  Moreover, unrealized profits or losses on open trading positions during the same period were at least $40 million.[41]

50.    According to an expert report analyzing the performance of Atlas trading accounts submitted in the CFTC Action, a substantial portion of these losses was caused by the fees and charges imposed by Monex.[42]  Specifically, the Expert Report compares the risk-return profiles for each account achieved with Atlas account trades (the "Atlas Account Execution"), and those achieved with futures contracts (the "Futures Market Execution") and Exchange Traded Funds (the "ETFs Execution"), both of which are more standard but functionally equivalent investment vehicles.[43]  Based on this analysis, the Expert Report finds that, among other things:  (1) "[a]n investor can always expect to earn a higher return with lower risk by choosing one of these functionally equivalent trading alternatives to the Atlas program"; and (2) "the results [of this analysis] flow from the cost structure of the Atlas Account itself, and not from any particular idiosyncratic features of the ten sample accounts."[44]  With respect to this latter finding, the Expert Report further notes that "fees, commissions and charges account for a large drag on the cumulative returns in these accounts" and "are

---

[40] *See* Gomberg Decl. at ¶ 141; *see also id.*, Ex. 63, Table E.

[41] *See id.*, Ex. 63, Table E.

[42] See Expert Report from Rutter Group, Appendix Vol. II, Ex. 3 (ECF No. 8-6) ("Expert Report"),

[43] *See id.* at 1.

[44] *Id.*

---

19

1   substantially elevated above levels charged in alternative models of executing what

2   are fundamentally the same trades."[45]

3   **D.    Defendants' False Information Regarding The Risks And Benefits**

4   **Of The Atlas Program**

5   51.    Despite Defendants' actual review of and/or access to reports

6   containing detailed information about Atlas customers' transactional data,

7   including data indicating that the vast majority of leveraged Atlas accounts suffer

8   massive losses, Monex does not disclose the significant risk of loss associated with

9   leveraged Atlas account trading.

10   52.    To the contrary, Monex falsely claims in its advertisements and other

11   marketing communications that the Atlas program is a safe and profitable way to

12   invest in precious metals.  Monex targets its deceptive advertisements and other

13   marketing communications at retail investors—many of whom lack significant

14   experience in commodities trading—to induce them to invest in Atlas accounts,

15   and with the intent that they rely upon the deceptive advertisements and marketing

16   communications in making their investments.

17   **3.   Monex Falsely Touts The Atlas Program As A Way For**

18   **Prospective Customers To Benefit From The Purported**

19   **Intrinsic Value, Security, And Profitability Of Precious**

20   **Metals Investments**

21   53.    As part of Defendants' business model, Monex first encourages

22   prospective customers to open an Atlas account through advertisements and other

23   communications touting the purported benefits of investing in precious metals as a

24   hedge against inflation.  For example, on Monex's website, the Company claims in

25   relevant part:

26   > For thousands of years, in good times and bad, precious
> metals have offered investors a solid, long-term and

27   [45] *Id.* at 11.

> tangible way to hold and protect wealth with relative safety. Unlike paper investments (like stocks, bonds and currencies) that can and have become worthless overnight, precious metals have true intrinsic value . . . and, hence, will always be valuable.[46]

54. Similarly, Monex describes precious metals investments as a form of "wealth insurance" in unstable financial markets, stating in relevant part:

> Today's financial markets are increasingly at risk from terrorism, political instability and war. As we saw so after the 9/11 tragedy, financial markets can be closed down, and remain closed down, for extended periods of time. As terrorism incidents continue to increase around the world, it is not unreasonable to expect further (and potentially more severe) disruptions in financial markets, banking and commerce in the future. Whenever and wherever tension or hostilities break out, people everywhere quite naturally gravitate toward the assets they trust most. And today, even in our high-tech-driven 21st century, the asset class millions rely on in times of trouble is gold and silver. Precious metals have always been, and likely will continue to be, a valued form of "wealth insurance" in good times and bad.[47]

55. In addition to highlighting the intrinsic value and security of precious metals investments, Monex also emphasizes their profitability, stating that "in recent years, precious metals have also proven to be outstanding short-term trading vehicles, offering traders periods of outstanding profit potential as metals prices fluctuate, sometimes dramatically, on world markets."[48]

56. After touting the intrinsic value, security, and profitability of precious metals investments, Monex goes on to pitch its Atlas program as a way for prospective customers to reap these putative benefits. For example, Monex's

---

[46]  Monex Precious Metals, Uncertainty in the Markets, http://www.monex.com/why/mktuncertainty.html.

[47]  Monex Precious Metals, Three Good Reasons to Own Precious Metals Now, http://www.monex.com/why/3goodreasons.html.

[48]  Monex Precious Metals, Uncertainty in the Markets, http://www.monex.com/why/mktuncertainty.html.

website describes the Atlas trading account as "a way to buy, sell and trade precious metals using up to 4-to-1 investment leverage" and "a powerful short-term trading vehicle during periods of rapidly changing metals prices."[49]

57.    In addition, the Atlas program brochure distributed to prospective Atlas customers claims, among other things, that:

> (1) the Atlas program is a "unique and powerful way to acquire precious metals with the strength of investment leverage combined with the safekeeping security of independent depository storage";
>
> (2) investing in precious metals through the Atlas program allows Atlas customers to "protect [themselves] from further declines in the value of the U.S. dollar";
>
> (3) the Atlas program provides a way for Atlas customers to "shield [their] wealth against the ravaging effects of inflation, deflation and other economic calamities"; and
>
> (4) "right now may be an ideal time to invest in precious metals with the power and built-in security of the Atlas Account."[50]

58.    Likewise, Monex's sales training materials instruct account representatives to pitch the Atlas program to prospective Atlas customers as a safe and profitable investment opportunity.   For example, Monex account representatives are trained to use the following phrases, among others, on sales calls with potential clients:

> (1) "If gold were to increase in value by $100 per ounce in the next year, and you had a 30% to 40% net gain, you'd feel pretty good, wouldn't you?";[51]

---

[49] Monex Precious Metals, Three Good Reasons to Own Precious Metals Now, http://www.monex.com/why/3goodreasons.html.

[50] Monex Deposit Company and Monex Credit Company, *The Atlas Account:  A Precious Metals Investment Program*, 1-2 (2017), http://www.monex.com/atlas-brochure.pdf.

[51] Gomberg Decl., Ex. 28 (Monex "Blueprint for Success" Sales Training Guide), at 4.

(2) "I'd like to show you some ways that you might earn a very positive return on investments in precious metals today";[52]

(3) "[D]iscover an opportunity to invest with defined risk, while enjoying the possibility of unlimited upside potential";[53] and

(4) "Since you're looking for short term profit, but with defined risk, I think you're going to love the proposal I have for you."[54]

59.    Monex account representatives also tell prospective Atlas customers on sales calls that investing in precious metals through the Atlas program has limited downside risk because precious metals always maintain their intrinsic value, even as market prices fluctuate.[55]

60.    Contrary to these representations, Defendants knew or recklessly disregarded that leveraged Atlas account trading did not provide a way for Atlas customers to benefit from the purported security, intrinsic value, and profitability of precious metals investments because:  (1) the vast majority of leveraged Atlas trading accounts sustain losses due, in large part, to the commissions, spreads, service fees, and interest on loans that Monex charges; and (2) the "intrinsically valuable" physical metals that Atlas customers supposedly "own" are never actually delivered to them and can be force-liquidated by Monex at any time, without notice.

### 4. Monex Misleadingly Assures Customers That They Have Exclusive Control Over Their Precious Metals Investments

61.    The Atlas program brochure also assures existing and prospective customers that their precious metals investments are exclusively within their control, stating that:

---

[52] *Id.* at 16.
[53] *Id.* at 18.
[54] *Id.* at 24.
[55] *See id.*

(1) "[t]he depository custodian will maintain the safekeeping of your precious metals until you decide to sell them or take personal possession";

(2) "[y]our metals are your sole assets"; and

(3) "[y]ou are the sole owner of your metals and the sole decision maker on when to buy and sell them."[56]

62.    Contrary to these representations, Defendants knew or recklessly disregarded that Atlas customers did not have exclusive control over their precious metals investments because:  (1) Monex can issue margin calls on Atlas accounts that will result in the liquidation of Atlas customers' metals if additional funds are not deposited into their accounts; (2) Monex can force-liquidate Atlas customers' trading positions without notice if certain minimum equity requirements (set by Monex) are not met; and (3) in fact, a significant number of Atlas customers were subject to margin calls and/or forced liquidation of their trading positions during the Class Period.

### 5. Monex Account Representatives Falsely Describe Themselves As "Fiduciaries" To Atlas Customers

63.    Monex's sales training materials also instruct account representatives to make statements to prospective Atlas customers designed to earn their trust. Specifically, Monex's sales training videos direct account representatives to tell prospective Atlas customers who seem reluctant to open an Atlas account that the account representatives will be serving as the Atlas customers' fiduciaries and, as such, will be acting in the customers' best interests.

64.    In one sales training video, for example, Monex sales staff are instructed to state the following to prospective Atlas customers:  "I want to give you the best possible chances of success in the markets that we deal with.  And

---

[56] Monex Deposit Company and Monex Credit Company, *The Atlas Account:  A Precious Metals Investment Program*, 5-6 (2017), http://www.monex.com/atlas-brochure.pdf.

everything that I ask will always be in your best interests."[57]  The video further trains Monex sales staff to state: "Or I might even use the analogy where if you go to your lawyer and you hold back any information, what is he going to tell you? Take a walk, I can't help you.  Okay.  We have a fiduciary relationship, a relationship of trust, okay.  And I do want to help you.  And, again, everything that I do—and I tell them this on a pretty consistent basis, that everything I do will always be in your best interests, and I mean that."  And in another sales training video, a Monex sales trainer calls a prospective Atlas customer in front of the sales training class and says that "my job is to do the best that I can do and do what's in the best interests that I talk to . . . . [I]f I am going to make a recommendation, I want to make sure that I do what's in your best interests."

65.    Having been trained in this manner, Monex account representatives go on to assure prospective Atlas customers on sales calls that they will provide investment advice, closely monitor their accounts, and take appropriate steps to protect their investments.

66.    Contrary to these claims, Defendants knew or recklessly disregarded that Monex account representatives did not serve as fiduciaries for Atlas customers because Monex trains and incentivizes its account representatives—through compensation tied directly to account volume and trading activity, rather than account performance—to engage in high-pressure sales tactics aimed at encouraging customers to open Atlas accounts and place frequent leveraged trade orders.

---

[57] *See* Gomberg Decl., Ex. 29 (Transcript of Monex Sales Training Video, Part 1), at 14-15.

### E.   Plaintiff And Other Class Members Invested In The Atlas Program And Suffered Losses

67.   After being solicited by Monex through advertisements, marketing materials, and/or phone calls conveying the foregoing misrepresentations, Plaintiff and other Class members invested in the Atlas program, as Defendants intended, and invariably suffered financial losses as a result thereof.

68.   To the extent the Atlas Account Agreements contained boilerplate disclosures vaguely describing the risks associated with precious metals investments and leveraged trading, such generalized disclosures buried within thirty-five pages of small-type legal jargon were insufficient to dispel the false impression created by Monex's affirmative misrepresentations, which concealed the true nature, design, structure, and operation of the Atlas program.

69.   For example, Monex's statements touting the Atlas program's purported security were designed to assure Atlas customers that leveraged Atlas account trading involved limited downside risk.  Monex account representatives reinforced this impression by promising Atlas customers that their investments were safe and downplaying or concealing the risks associated with precious metals investments or leveraged trading.

70.   Additionally, Monex's claims regarding the intrinsic value of precious metals investments were aimed at making Atlas customers think they "owned" the physical metals.  Atlas customers had no way of knowing that, in fact, they would never have actual possession of these assets, or that Monex could force-liquidate their trading positions.

71.   Moreover, by pitching the Atlas program as a profitable investment opportunity, Monex sought to convince Atlas customers that they would earn returns on their investments sufficient to offset any fees charged by Monex.  Atlas customers were therefore unaware of the strong likelihood that they would

experience margin calls and/or forced-liquidation of their trading positions as a result of such fees eroding the equity in their Atlas accounts.

72.     Finally, Monex directed its account representatives to falsely portray themselves as fiduciaries in order to lead Atlas customers to believe that Monex served as a brokerage house, rather than a market maker, and that precious metals markets, rather than Monex itself, determined the prices of their trades.   Atlas customers did not understand that, in fact, Monex served as a counterparty (*i.e.*, the seller and/or purchaser) for each transaction and had the authority to impose outsized price spreads on every trade.   Thus, Atlas customers had no reason to know that Monex stood to profit at their direct expense.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

73.     Plaintiff and members of the Class had no way of knowing about Defendants' scheme and deception with respect to the Atlas program until the CFTC Action was filed on September 6, 2017.

74.     Any applicable statute of limitations has been tolled by Defendants' knowing, active concealment and denial of the facts alleged herein throughout the Class Period.   Through no fault or lack of diligence, Plaintiff and members of the Class were deceived by Defendants and could not reasonably discover that Defendants were concealing the misconduct complained of herein and misrepresenting the true facts related to the Atlas program, including the significant risk of loss associated therewith.

75.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were engaged in the deceptive scheme and were misrepresenting the significant risk of loss associated with the Atlas program, nor would a reasonable and diligent investigation disclosed the true facts.

76.     As alleged herein, the true facts regarding the Atlas program, including the significant risk of loss associated therewith, were material to Plaintiff and members of the Class at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants were concealing the true facts regarding the Atlas program, including the significant risk of loss associated therewith.

77.     At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and members of the Class the true facts regarding the Atlas Program, including the significant risk of loss associated therewith.

78.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including Defendants' true nature, design, structure, and operation of the Atlas program and the significant risk of loss associated therewith.  Plaintiff and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

79.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' active concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class:

> All persons in the United States who opened an Atlas account with Monex and sustained losses in connection therewith, and who seek damages not exceeding $50,000.00 (the "Class").

81.     Excluded from the Class are Defendants and any entities in which they have a controlling interest, and their legal representatives, officers, directors, assignees, and successors.  Plaintiff reserves the right to revise the definition of the

Class based upon subsequently discovered information and reserves the right to establish additional Sub-Classes where appropriate.

82.     The Class is so numerous that joinder of all members is impracticable. Plaintiff believes that there are at least thousands of members of the proposed Class throughout the United States.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class.  The common and predominating questions of law and fact include, but are not limited to:

(1)   Whether Defendants violated the CEA, 7 U.S.C. § 1, *et seq*.;

(2)   Whether Defendants violated the CLRA, Cal. Civ. Code § 1750, *et seq*.;

(3)   Whether Defendants violated the UCL, Cal. Bus. & Prof. Code § 17200, *et seq*.;

(4)   Whether Defendants fraudulently induced consumers to invest in the Atlas program;

(5)   Whether the Atlas program exposes consumers to a significant risk of loss;

(6)   Whether Defendants knew or should have known that the Atlas program exposes consumers to a significant risk of loss;

(7)   Whether Defendants had a duty to disclose the significant risk of loss associated with the Atlas program;

(8)   Whether Defendants breached their duty to disclose the significant risk of loss associated with the Atlas program;

(9)   Whether Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts

concerning the Atlas program, including the significant risk of loss associated therewith;

(10)   Whether Defendants made material misrepresentations and/or omissions concerning the true nature, structure, design, and operation of the Atlas program and the significant risk of loss associated therewith;

(11)   Whether members of the Class were exposed to Defendants' material misrepresentations and/or omissions;

(12)   Whether members of the Class would have invested in precious metals through the Atlas program if Defendants had disclosed the true nature, structure, design, and operation of the Atlas program and the significant risk of loss associated therewith;

(13)   Whether Defendants actively concealed material facts from Plaintiff and members of the Class in order to, *inter alia*, generate more revenue for the Company;

(14)   Whether Defendants were unjustly enriched by their conduct; and

(15)   Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

84.   Plaintiff's claims are typical of the claims of the Class Plaintiff seeks to represent.  As alleged herein, Plaintiff and the Class sustained damages arising out of the same illegal actions and conduct by Defendant.

85.   Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or in conflict with the interests of the other members in the Class.

86.   Plaintiff's interests are co-extensive with and are not antagonistic to those of absent members within the Class.  Plaintiff will undertake to represent and

protect the interests of absent members within the Class and will vigorously prosecute this action.

87.    Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent members of the Class.

88.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

89.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

90.    The Class may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

91.    The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

92.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the

resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, those listed in ¶ 79 herein.

93. The interest of members within the Class in individually controlling the prosecution of separate actions is theoretical and not practical. Class members have a high degree of similarity and are cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

94. The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers and/or on the internet.

## VII. CLAIMS FOR RELIEF

**COUNT I**
**Violation of Section 4b(a)(2)(A) and (C) of the Commodity Exchange Act**
**(Against Monex)**

95. Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

96. Plaintiff brings this count on behalf of himself and the members of the Class.

97. During the Class Period, Defendants MDC, MCC, and NSC, both individually and as a common enterprise, and acting through their various officers, employees, or agents, engaged in a scheme that involved: (1) defrauding or attempting to defraud retail customers; and (2) willfully deceiving or attempting to deceive retail customers in connection with the disposition or execution of retail commodity transactions.

98. Monex knowingly and/or recklessly made material misrepresentations to retail customers about the safety, security, and profitability of investing in precious metals investments through its Atlas trading program, and concealed,

suppressed, and/or omitted material facts necessary to make those representations not misleading in any material respect.

99.   Monex knowingly and/or recklessly made material misrepresentations and omitted material facts regarding the benefits and risks of Atlas program with the intent to induce Plaintiff and members of the Class into believing that the Atlas program was a safe and profitable way to invest in precious metals.

100.   In ignorance of the true nature, structure, operation, and design of the Atlas program and the significant risk of loss associated therewith, and in reliance on Monex's materially false and misleading statements regarding the benefits of the Atlas program, Plaintiff and members of the Class reasonably believed that the Atlas program was a safe and profitable way to invest in precious metals.  Had Monex disclosed that the Atlas program is structured in such a way that Atlas customers are highly likely to sustain losses, Plaintiff and members of the Class would not have invested in precious metals through the Atlas program.

101.   Pursuant to Section 2(c)(2)(D)(iii) of the CEA, 7 U.S.C. § 2(c)(2)(D)(iii) (2012), the retail commodity transactions alleged herein constitute contracts of sale of a commodity for future delivery and are therefore subject to Section 4b of the CEA, 7 U.S.C. § 6b (2012).

102.   By virtue of the foregoing conduct, Monex has violated Section 4b(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C) (2012).

103.   Each act of defrauding or attempting to defraud retail customers, willfully making or causing to be made to retail customers false reports or statements, or willfully deceiving or attempting to deceive retail customers in regard to orders for, or the disposition or execution of, retail commodity transactions, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C).

104.   As a direct and proximate result of Monex's violations of the CEA, Plaintiff and members of the Class have suffered damages in connection with their precious metals investments through the Atlas program during the Class Period.

## COUNT II
### Violation of Section 13(a) of the CEA
#### (Against the Individual Defendants)

105.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

106.   Plaintiff brings this count on behalf of himself and the members of the Class.

107.   Each of the Individual Defendants willfully aided, abetted, counseled, induced, and/or procured Monex's violations of Section 4b(2)(A) and (C) of the CEA within the meaning of Sections 13(a) and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a).

108.   During the Class Period, the Individual Defendants were substantially involved in overseeing the Company's operations and had knowledge of Monex's intent to violate Section 4b(2)(A) and (C) of the CEA based on their control over the false and misleading statements alleged herein and regular review of and/or access to internal reports provided to them containing detailed transactional data for each Atlas account.

109.   By virtue of their high-level positions, agency, ownership, and participation in and/or awareness of the Company's operations and/or knowledge of the conduct alleged herein, the Individual Defendants knowingly induced, directly or indirectly, the acts constituting Monex's primary violations of Section 4b(2)(A) and (C) of the CEA alleged herein.

110.   The Individual Defendants acted in furtherance of Monex's intent to violate Section 4b(2)(A) and (C) of the CEA by controlling the content of Monex's deceptive advertising and promotional materials, and training and incentivizing

Monex's account representatives to engage in deceptive sales and marketing practices.

111.   As a result, the Individual Defendants are liable for aiding and abetting Monex's primary violations of Section 4b(2)(A) and (C) of the CEA pursuant to Sections 13(a) and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a).

**COUNT III**
**Violation of the CLRA, Cal. Civ. Code § 1750, *et seq*.**
**(Against Monex)**

112.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

113.   Plaintiff brings this count on behalf of himself and the members of the Class.

114.   The CLRA "protect[s] consumers against unfair and deceptive business practices."  Cal. Civ. Code § 1760.

115.   Plaintiff and members of the Class are consumers within the meaning of Cal. Civ. Code § 1761(d).

116.   The conduct complained of herein involves "goods," "services," and "transactions" within the meaning of Cal. Civ. Code § 1761(a), (b) and (e).

117.   Monex violated and continues to violate the CLRA by engaging in unfair and deceptive trade practices, including, *inter alia*: (1) representing that the Atlas program's precious metals investments and investment services have characteristics or benefits that they do not have or that Monex account representatives have a status that they do not have; (2) representing that the Atlas program's precious metals investments and investment services are of a particular standard or quality when they are of another; (3) advertising the Atlas program's precious metals investments and investment services with the intent not to sell such goods or services as advertised; and (4) representing that Atlas customers will

receive an economic benefit contingent on an event to occur subsequent to the consummation of their transactions. *See* Cal. Civ. Code § 1770.

118.   Monex also violated the CLRA by actively concealing the material fact that Atlas customers are exposed to significant risk of loss by virtue of the nature, structure, design, and operation of the Atlas program.

119.   The fact that Atlas customers are exposed to significant risk of loss by virtue of the nature, structure, design, and operation of the Atlas program is material because Plaintiff and members of the Class had a reasonable expectation that the Atlas program offered a safe and profitable way to invest in precious metals.  Based on Monex's representations, no reasonable consumer would expect to suffer losses in the manner complained of herein by investing in the Atlas program.

120.   When Plaintiff and members of the Class opened their Atlas accounts or placed leveraged trading orders through the Atlas program, they reasonably relied on the reasonable expectation that the Atlas program was a safe and profitable way to invest in precious metals.  Had Monex disclosed that the Atlas program is structured in such a way that Atlas customers are highly likely to sustain losses, Plaintiff and members of the Class would not have invested through the Atlas program.

121.   Monex has knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein.  Further, Monex unconscionably marketed the Atlas program to uninformed consumers in order to maximize profits by inducing prospective Atlas customers to open Atlas accounts and place leveraged trading orders.

122.   Monex's unlawful acts and practices affect the public interest, and trade and commerce in the State of California, and present a continuing financial risk to Plaintiff and members of the Class.

123.   As a direct and proximate result of Monex's violations of the CLRA, Plaintiff and members of the Class have suffered actual damages and/or injury in fact, including, *inter alia*, out-of-pocket losses on their precious metals investments.

124.   Monex's violations of the CLRA were willful and oppressive.

125.   With this filing, and on this Count, Plaintiff and members of the Class seek an order enjoining Monex's unfair and deceptive practices.[58]

## COUNT IV
### Violation of the UCL, Cal. Bus. & Prof. Code § 17200, *et seq*.
### (Against Monex)

126.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

127.   Plaintiff brings this count on behalf of himself and the members of the Class.

128.   The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq*.

129.   As alleged herein, Monex has violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices.

130.   In violation of the UCL, Monex violated the CEA and the CLRA, as alleged in Counts I and III herein.

131.   In violation of the UCL, Monex employed unfair, unlawful and deceptive acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely

---

[58] On November 6, 2017, Plaintiff provided Monex with notice of his and the Class's CLRA claims and the opportunity to correct same within thirty (30) days, pursuant to Cal. Civ. Code § 1782(a). If Monex does not correct this violation before this period has expired, Plaintiff will have the right to seek damages on behalf of himself and the Class against Monex pursuant to Cal. Civ. Code §§ 1780, 1782.

upon such concealment, suppression or omission, in connection with the marketing and operation of the Atlas program.  Monex knowingly concealed, suppressed and/or omitted material facts regarding the Atlas program and significant risk of loss associated therewith, and misrepresented the benefits of the Atlas program, which directly caused harm to Plaintiff and members of the Class.

132.   Monex actively suppressed the fact that Atlas customers are exposed to significant risk of loss by virtue of the nature, structure, design, and operation of the Atlas program.  Further, Monex employed unfair, unlawful, and fraudulent business practices to induce Plaintiff and other Class members to open Atlas accounts and place leveraged trading orders in violation of the UCL.

133.   Monex's unfair, unlawful, and fraudulent business practices were likely to deceive a reasonable consumer.  Plaintiff and members of the Class had no reasonable way to know that Atlas customers are exposed to significant risk of loss by virtue of the nature, structure, design, and operation of the Atlas program. Monex possessed superior knowledge as to the nature, structure, design, and operation of the Atlas Program, including the significant risk of loss associated therewith, and any reasonable consumer would have relied on Monex's misrepresentations and omissions as Plaintiff and members of the Class did.

134.   Monex intentionally and knowingly misrepresented and omitted material facts regarding the nature, structure, design, and operation of the Atlas program and significant risk of loss associated therewith with the intent to mislead Plaintiff and members of the Class.  Monex knew, or should have known, that the Atlas program is structured in such a way that Atlas customers invariably sustain losses.

135.   Monex owed a duty to disclose the material facts regarding the nature, structure, design, and operation of the Atlas program and significant risk of loss associated therewith to Plaintiff and members of the Class because Monex

possessed superior and exclusive knowledge regarding the Atlas program and the performance of Atlas accounts.   Rather than disclose these material facts to Plaintiff and members of the Class, Monex engaged in unfair, unlawful and fraudulent business practices in order to induce them to open Atlas accounts and place leveraged trading orders.

136.   Monex's unfair, unlawful, and fraudulent acts or practices, affirmative misrepresentations and/or material omissions regarding the Atlas program were intended to mislead consumers and misled Plaintiff and members of the Class.

137.   At all relevant times, Monex's unfair and deceptive acts or practices, affirmative misrepresentations, and/or omissions regarding the Atlas program and the significant risk of loss associate therewith were material to Plaintiff and members of the Class.   When Plaintiff and members of the Class opened their Atlas accounts or placed leveraged trading orders through the Atlas program, they reasonably relied on the reasonable expectation that the Atlas program was a safe and profitable way to invest in precious metals.   Had Monex disclosed that the Atlas program is structured in such a way that Atlas customers are highly likely to sustain losses, Plaintiff and members of the Class would not have invested through the Atlas program.

138.   Monex had a continuous duty to Plaintiff and members of the Class to refrain from unfair, unlawful, and fraudulent practices under the UCL and to disclose the material facts regarding the nature, structure, design, and operation of the Atlas program and the significant risk of loss associated therewith.   Monex's unfair, unlawful, and fraudulent acts or practices, affirmative misrepresentations, and/or material omissions regarding the Atlas program and the significant risk of loss associated therewith are substantially injurious to consumers.   As a result of Monex's knowing, intentional concealment and/or omission of the material facts regarding the nature, structure, design, and operation of the Atlas program and the

significant risk of loss associated therewith, and in violation of the UCL, Plaintiff and members of the Class have suffered harm and/or continue to suffer harm and damages to be determined at trial.  Atlas customers also suffered ascertainable injury in the form of, *inter alia*, out-of-pocket losses on their precious metals investments as a result of Monex's unfair, unlawful, and fraudulent acts and practices in the course of its business.

139.   Monex has knowingly and willfully engaged in the unfair, unlawful, and fraudulent business practices alleged herein.  Further, Monex unconscionably marketed the Atlas program to consumers in order to maximize profits by inducing prospective Atlas customers to open Atlas accounts and place leveraged trading orders.

140.   Monex's unfair, unlawful, and fraudulent acts and practices have harmed and continue to harm Plaintiff and members of the Class, have negatively affected the public interest, and present a continuing financial risk to Plaintiff and members of the Class.

141.   Plaintiff and members of the Class seek an order enjoining Monex's unfair, unlawful, and fraudulent practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the UCL and California law.

### COUNT VI
### Fraudulent Concealment
### (Against All Defendants)

142.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

143.   Plaintiff brings this claim on behalf of himself and the members of the Class.

144.   Defendants intentionally concealed material facts regarding the nature, design, structure, and operation of the Atlas program and the significant

risk of loss associated therewith, or acted with reckless disregard for the truth, and denied Plaintiff and the other members of Class information that was highly relevant to their decision to invest in the Atlas program.

145.   Defendants had a duty to disclose the material facts regarding the nature, design, structure, and operation of the Atlas program and the significant risk of loss associated therewith to Plaintiff and other members of the Class.

146.   Plaintiff and other members of the Class were ignorant of the truth that Atlas customers were exposed to significant risk of loss by virtue of the nature, structure, design, and operation of the Atlas program.

147.   The aforementioned concealment was material because, had Plaintiff and members of the Class known about nature, design, structure, and operation of the Atlas program and the significant risk of loss associated therewith at the time they opened their Atlas accounts or placed leveraged Atlas trading orders, they would not have opened such accounts or entered into such transactions.

148.   Defendants intentionally concealed material facts regarding the nature, design, structure, and operation of the Atlas program and the significant risk of loss associated therewith with the intent to mislead Plaintiff and members of the Class in order to induce them to open Atlas accounts and place leveraged trading orders.

149.   As a result of their reliance on Defendants' fraudulent concealment, Plaintiff and members of the Class are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial.

## COUNT VII
### Unjust Enrichment
### (Against All Defendants)

150.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

151.   Plaintiff brings this count on behalf of himself and the members of the Class.

152.   Plaintiff and members of the Class conferred a benefit on Defendants by opening Atlas accounts and placing leveraged trading orders.  Defendants were and should have been reasonably expected to have acted in the best interests of Plaintiff and members of the Class by, *inter alia*, actively monitoring the performance of their Atlas accounts, providing them with investment advice, taking appropriate steps to protect their investments, and adequately explaining the risks associated with the Atlas program.

153.   Defendants unjustly profited as a result of Monex's false representations, omissions and concealment of material facts regarding the nature, structure, design, and operation of the Atlas program and significant risk of loss associated therewith, which fraudulently induced Plaintiff and other Class members to open Atlas accounts and place leveraged trading orders.

154.   As a proximate result of Monex's false representations, omissions and concealment of material facts regarding the nature, structure, design, and operation of the Atlas program and significant risk of loss associated therewith, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.  It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiff and members of the Class.

155.   Plaintiff and members of the Class are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct.

156.   Plaintiff and members of the Class seek an order requiring Defendants to disgorge their gains and profits to Plaintiff and members of the Class, together with interest, in a manner to be determined by the Court.

## VIII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

(1) An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class, and Plaintiff's counsel as counsel for the Class;

(2) An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

(3) Appropriate injunctive and equitable relief;

(4) A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

(5) An order awarding costs, restitution, disgorgement, punitive damages, statutory damages, treble damages, and exemplary damages under applicable law, and compensatory damages for economic loss, diminished value, and out-of-pocket costs in an amount to be determined at trial;

(6) An order awarding any applicable statutory and civil penalties;

(7) An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

(8) An award of costs, expenses, and attorneys' fees as permitted by law; and

(9) Such other or further relief as the Court may deem appropriate, just, and equitable.

1

## IX.   DEMAND FOR JURY TRIAL

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial

3     by jury of any and all issues in this action so triable of right.

4

5     DATED:  November 6, 2017                    Respectfully submitted,

6

7                                                /s/ Robert G. Loewy
                                                 **LAW OFFICE OF**
8                                                   **ROBERT G. LOEWY, P.C**.
                                                 Robert G. Loewy
9                                                20 Enterprise, Suite 310
                                                 Aliso Viejo, California 92656
10                                               Telephone:  (949) 468-7150
                                                 Facsimile:  (949) 242-5105
11                                               rloewy@rloewy.com

12                                               **KESSLER TOPAZ MELTZER**
                                                   **& CHECK, LLP**
13                                               Joseph H. Meltzer
                                                 Geoffrey C. Jarvis
14                                               Meredith L. Lambert
                                                 280 King of Prussia Road
15                                               Radnor, PA 19087
                                                 Telephone: (610) 667-7706
16                                               Facsimile: (610) 667-7056
                                                 jmeltzer@ktmc.com
17                                               gjarvis@ktmc.com
                                                 mlambert@ktmc.com

18                                                           -and-

19                                               **ROBBINS GELLER RUDMAN**
                                                   **& DOWD LLP**
20                                               Stuart A. Davidson
                                                 Mark J. Dearman
21                                               Jason H. Alperstein
                                                 Ricardo J. Marenco
22                                               120 East Palmetto Park Road, Suite 500
                                                 Boca Raton, FL 33432
23                                               Telephone:  (561) 750-3000
                                                 Facsimile:  (561) 750-3364
24                                               sdavidson@rgrdlaw.com
                                                 mdearman@rgrdlaw.com
25                                               jalperstein@rgrdlaw.com
                                                 rmarenco@rgrdlaw.com
26
                                                 *Counsel for Plaintiff and the Proposed*
27                                               *Class*

28